Good morning, Your Honors. May it please the Court. My name is Daniel Blank, and I represent Mr. Ingram, the defendant, in this case. Mr. Ingram is present in the courtroom. I'd like to reserve three minutes for rebuttal, if I may. Your Honors, Mr. Ingram was seized and his vehicle was searched within the meaning of the Fourth Amendment. The question, was he seized? He was, indeed, Your Honor, within the meaning of the Fourth Amendment. If you're seized, you're in good shape. I am, and I think the fact that it was searched also means that I'm in good shape. I think, actually, the search may be an easier question. The officer was unable to perceive the smell of marijuana smoke before Mr. Ingram complied with the order to roll down the window, and the officer ---- Was it an order? It was. It was not a request, and the party stipulated below, and the district court found based upon the stipulation, that it was not consensual. It was a direction. It was ---- Well, consensual, whether it's consensual or not does not answer the question of whether it was an order, because one may consent to a request as opposed as easily as to an order. So that's why I ask you, was it an order or was it a request? It was an order. He was politely but firmly directed to roll down the window, and Mr. Ingram reasonably believed that he was not free to disregard the order or to leave. What did the officer say he said? What the officer didn't say what he said, he said. Your Honor, the officer's declaration was summary in its recounting of the conversation. It doesn't say. Was there a hearing on this? There was not a hearing, and the reason why there was not a hearing was that the party stipulated to the facts. And that's found at ---- It didn't stipulate to exactly what the officer said. That's correct. But we stipulated that it was not a consensual encounter. Well, but that doesn't help us. Well, what it says is that he then approached the window and directed Mr. Ingram to roll down the window, directed, not requested, directed. And that's at page 61 of the excerpt of the record. So at that point, Mr. Ingram reasonably believed that he was not free to leave or disregard the order, and the compelled opening of the window allowed the officer better to perceive through his senses the contents of the vehicle. And that's why it's both a seizure and a search. In addition, the party stipulated that there was not reasonable suspicion. So the encounter violated the Fourth Amendment, and the district court erred by failing to suppress the fruits. The fact that there was a direction to do something ---- Is that the seizure, the direction? Yes, Your Honor. It wasn't merely approaching the car.  I'm not saying that I was saying that merely approaching a car is a seizure. It's not, well, at least not in this case. One can imagine a situation which ---- Don't you have a little more than the direction? In other words, you've got an armed police officer on each side of the car, and one of them says, open the window. Yes, Your Honor. Now, if that officer had been standing 10 feet away and not armed and did not have a companion, then ---- Much less likely there would be a seizure. That's correct, Your Honor. I think having both of them really ensures that it is a seizure. Merely approaching a car, an officer ---- it's not necessarily a seizure. One can imagine a seizure in which 50 armed SWAT people, you know, approach a car, and that would itself be a seizure. But in this case, we have more than that. We have, as Your Honor said, two armed uniformed police officers on either side of the car, and then a direction, not a request. As I recall, he said that the windows were foggy or tinted. He couldn't see. Not tinted, but foggy. That was what the officer said in his declaration. He couldn't see from far away. And that's why he approached the window. But there's no ---- there was no claim by the officer that once he was at the window, he couldn't see inside. Counsel, how do you distinguish the Eighth Circuit case, United States v. Berry? Berry? Berry, B-A-R-R-Y. Are you familiar with that case? I'm not. I'm not sure that that was cited in the briefs. That's my law clerk. Someone's law clerk found this case. I didn't receive the bench memo, Your Honor, so. So I'm afraid I don't know. But if Your Honor would like, I can file a letter. That's all right. I think the case that was closest that was cited by the government is Kim. In that case, you also had an approach of a stopped car. But what's different about that case is that the district court found, and this court held it was not clearly erroneous to find, that the encounter was consensual. And what happened is that the officer in that case requested leave to ask the person, being the defendant, some questions. That's what happened in Kim, and that's not what happened here. Counsel, what's your response to the welfare check argument that the government makes? I think that it's a fine thing that officers are genuinely motivated by the public welfare when doing their work. I think we all hope that they do. But merely calling something a welfare check cannot insulate it from the Fourth Amendment. And what the Supreme Court and this Court have made clear is that the subjective intent of the officers is irrelevant to nearly every Fourth Amendment analysis. The only time it's not is in the context of an inventory search. But in every other context, it's irrelevant. So whether they were motivated by checking on the welfare or not is of no moment constitutionally. And as a factual matter, once they approached the window, and he couldn't see through the foggy window far away, but when he got close, he obviously could communicate with the person, with Mr. Ingram, through the closed window. He could see that no one was in danger. And that's what makes this case different from the Castellanos case, the D.C. Circuit case cited also by the government, in which there was a man who was O.D.ing on drugs inside the car. And there you have an exigency that requires officer action. And there was nothing like that here. And in fact, in the Castellanos case, the doors were already open because the fireman had arrived and ripped open the doors. But there was no ---- I'm sorry, Your Honor. I'm sorry. Did the parties stipulate that there was no reasonable suspicion? Yes, we did, Your Honor. That's also at page 61, that the ---- he did not have reasonable suspicion of criminal activity, that he approached the window and directed Mr. Ingram to roll down the window, and that the encounter was not consensual. Your Honor, I'll reserve the balance of my time. Thank you. All right. Thank you, counsel. May it please the Court, my name is Susan Knight, and I represent the government in this matter. Your Honor, as Mr. Blank just outlined, the sole issue in this case is whether the Mr. Ingram was seized within the meaning of the Fourth Amendment. And the government submits that he was not prior to the officers smelling marijuana when Mr. Ingram rolled down his window, and they were able to seize him based on plain smell and plain view. But let me go back to the record. Reviewing the transcript, I would just like to point out that the government did not submit on the consensual issue, that the encounter was nonconsensual. The government agreed on line 61 that you ---- What page are you on? 61. ER 61? ER 61, that to the basic facts. I mean, granted, if you take that, Mr. Blank takes that one line in which I say that's a nonconsensual issue, and he agrees that as a government conceding the issue of consent. If you say it's correct, what else are we to make of that? Well, in hindsight, I agreed, I should have gone back and picked out the nonconsensual issue. I agreed to the basic facts of what the case were. But if you agreed to that, I mean, if those of you agreed upon facts, can you now say I didn't mean it? Well, if you look back on my argument on Excerpt of Record 65, I made a consent argument that Mr. Ingram ---- that Officer Martinez asked him to roll down his window. If you look at Officer Martinez's declaration that is on Excerpt of Record 45, he states that he asked Mr. Ingram if he could roll down his window. So there was a dispute and there was not a hearing on whether he was directed or ordered. As Mr. Ingram said, he was firmly but politely ordered to roll down the window, versus if he could roll down the window. And again, looking back to the facts, this is a car parked at night, poor weather conditions, in a national park. The officers could not see into the car. Are you saying reasonable suspicion? There was no reason ---- we'll concede there was no reasonable suspicion. It was a welfare check. The officers didn't know what was going on. They see this car parked by itself, they can't see into the car, so they approach the car to conduct what's a welfare check. Once he sees Mr. Ingram and can communicate with him, was there still reason for a welfare check at that point? I believe there was. Once he saw him, I mean, he was able ---- he wanted to talk to him. Why? If he could see him, nobody in the car was unconscious, there was no visible blood, no reason for alarm for anyone in the car, why would he need to talk to him at that point? Well, he could ---- Mr. Ingram could have been lost. There could have been a problem with their car. I mean, there's ---- If he was lost and needed directions, wouldn't he have initiated the conversation? If he needed assistance and saw an officer there, wouldn't it be reasonable for the person in need of assistance to initiate the contact? Or what in the officer's mind would lead ---- reasonably lead to an indication that there was a need for a welfare check at that point? Well, when ---- yeah, granted, I'll concede that if Mr. Ingram did need help and did need assistance, he would have got out of the car. But maybe Mr. Ingram didn't see the officer pull up. Maybe he ---- I mean, there's ---- there could be a million reasons why he didn't. I cannot speculate to that. But both officers ---- But you're asking us to speculate? I'm not asking you to speculate. I'm asking you to look at what the police did, look at whether what Officer Martinez did was a coercive tactic that seized Mr. Ingram at the time when he asked him to roll down his window. If there's no reasonable suspicion, it has to be anchored to something. And that's what we're asking you. What was that request, order, direction, what was it anchored to? I believe it was anchored to Officer Martinez just wanting to check on their welfare. I mean, I think asking him to roll down the window is not such an unreasonable request. I liken it to knocking on a door. I mean, whether he knocked on the door or asked him to roll down the window, I don't see any difference. I see it being similar to a knock and talk. What's your best case authority for your argument that a welfare check was indicated in this case? I think the Gipp case from the Eighth Circuit. The facts are similar. In the Gipp case in the Eighth Circuit, the officer was on patrol. He saw a car parked on the side of the road. He noticed the headlights were off, the dome lights were on, and there were occupants in the car. On his return trip, the officer passed the car, came back, and still saw the car parked there. So he decided to conduct a welfare check. In that case, the defendant got out of the car. That's a little different. It is different. But I think in this case, I mean, I think it's similar. I mean, Mr. Ingram was asked to roll down his window. He was told to get out of the car. Once he got out of the car, the officer detected the scent of marijuana about him, and that led to a robbery. That's correct. Yes. That led in here. But he there, the defendant put himself, voluntarily put himself in a place to be sniffed by the officer. But Mr. Ingram did the same thing here. After being told to roll down the window. Well, according to Officer Martinez's declaration, he was asked if he could roll down the window. In excerpt of record. Well, the stipulation, which you're now trying to retreat from, said that he, the officer, then approached the window and directed Mr. Ingram to roll down the window. Well, it was a he asked him to roll down the window, or directed. Direction doesn't mean, I don't think, specifically an order. I mean, there's no other evidence that he, you know, had he intimidated him into rolling down the window, that he had his gun drawn to run to roll down the window, that he. In other words, I think looking at the coercion, do you think if you look at what is the course of tactics are in some of the other cases, like the the plastic factors, you know, intimidation, you know, threatening language, gun on, on, you know. Or the suspect doesn't feel free to leave. Yeah, I mean. At the bottom line. Yeah, and in this case. So here with an armed, uniformed officer on each side of the car, and the officer on the driver's side saying, roll down the window. That's a direction, not a request, a direction. The guy does it. So why isn't that a seizure within the meaning of the term? Well, going back to just because you have officers armed and in uniform, well, everyone knows officers are armed in a uniform. I don't think that alone is compelling enough. Counsel, please, you're saying it alone in a parking lot with an officer on each side of the door, a reasonable person would feel he could just drive off. I believe that Mr. Ingram could have said, well, I don't want to roll down my window. Or what do you want? Or I'm fine. The test is whether a reasonable person would feel free to leave. And if he drove off, the police would have gotten in the car and chased him. Well, if he had drove off and the police chased him, that would be unconstitutional to stop him. So that would have been part of the welfare check, that would have been part of the welfare check. I mean, but that's not the facts of this case. The facts purely are officer approached a car late at night, could not see into the car. You have two officers, which can be an officer also is an officer's safety issue. They saw occupant, you know, they could not see in the car. Anybody is saying that the officers have to travel alone. I don't think that's the point. But the point is, what question is, at what point is there a seizure? There is a point when Mr. Ingram rolled down his window and the officer was able to smell marijuana coming out of the car, coupled with Mr. Ingram's admission that he had just smoked marijuana, coupled with the fact that the officer was able to see in plain view a marijuana blunt in the tray. I don't think anyone disagrees. And no one disagrees with that. I mean, we're here purely because whether of what the officer's actions were prior to rolling down the window. And I submit that it that it was he was not coerced into rolling down his window. Counsel, with officers at both sides of the car, I think it's pretty obvious that Mr. Ingram did not feel that he was free to leave. How important do you think that is? Well, I think it's important. But is it dispositive? I don't think it's dispositive, because you have two officers on each side, and they weren't doing anything threatening. They didn't come up and use intimidating language. They didn't have their guns drawn. One officer spoke. Officer Martinez spoke. That was the only person who spoke. The other officer did not say anything. So can that point? I mean. That's significant, though. You think that's a significant proof of seizure, that they didn't feel free to leave? I think, look, you have to focus on what the officers did. All right. Thank you. So what's your best case authority for the proposition that it's that what the officers did controls over whether a reasonable person would feel free to leave? I mean, I think, well, I think looking at the Mandelbrot-Hull test, the Court is correct. It's whether a reasonable person would feel free to leave. But I also think as part of that test, we have to look at what the officer's behavior was. But the bottom line is whether a reasonable person would have felt free to leave. That's true. Thank you. Oh, you say that if a reasonable person would think that he or she would not feel free to leave, it might follow that that's seizure. That really is suggesting a friendly question. Any time an officer walks up to me and talks to me, I will not feel free to leave, maybe constitutionally. All right. Thank you. Thank you. A doctor friend of mine years ago told me that one advantage lawyers have over doctors is that lawyers get to use a retrospectoscope. Unless the Court has questions and prepared to submit. Very smart decision. Thank you, Your Honor. The case just argued is submitted for decision by the Court. The last two cases on calendar, Sanchez v. Canberra and Brown v. Rowe, have been submitted on the briefs. This Court is adjourned.
judges: Reavley, T.G. Nelson, Rawlinson